# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

# 17-556

**WILBERT J. SAUCIER, JR.**

**VERSUS**

**ROBERT E. WASHINGTON, SR., ET AL.**

**\*\*\*\*\*\*\*\*\*\***

ON WRIT OF REVIEW FROM THE
ALEXANDRIA CITY COURT
PARISH OF RAPIDES, DOCKET NO. 130031
HONORABLE RICHARD E. STARLING, JR., CITY COURT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**SYLVIA R. COOKS**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, John D. Saunders, Phyllis M. Keaty and Kent D. Savoie, Judges.

**WRIT GRANTED AND MADE PEREMPTORY;**
**JUDGMENT RENDERED; REMANDED WITH INSTRUCTIONS.**

**Saunders, J., concurs in the result reached.**
**J.Savoie concurs with reasons.**

**Chris J. Roy, Jr.**
**A Law Corporation**
**P.O. Box 1592**
**Alexandria, LA  71309-1592**
**(318) 487-9537**
**and**
**Mark D. Plaisance**
**P.O. Box 796**
**Thibodaux, LA  70302-0796**
**(985) 227-4588**
**Attorneys for Applicants/Defendants, Robert E. Washington, Sr., et al.**

**Michael L. Glass**
**1733 White Street**
**Alexandria, LA  71301**
**(318) 445-3147**
**Attorney for Respondent/Plaintiff, Wilbert J. Saucier, Jr.**

**COOKS, J.**

## PROCEDURE AND FACTUAL BACKGROUND

Robert E. Washington, Sr.'s (Washington) ancestors, the Harrell family, acquired a 61.67 acre tract of land in 1929. Simon and Clara Harrell farmed the property and raised 16 children on this land. The family had ***undisturbed peaceable*** use of a right-of-way to their land for more than 80 years. In 1994, Wilbert J. Saucier, Jr. (Saucier) purchased 2,200 acres of land known as Erris-Omega Plantation. This large tract completely surrounds the Harrell heirs' acreage (Harrell acreage). Saucier tried, by his admission, multiple times to buy the Harrell acreage to no avail. In 1999, Saucier filed suit against the Harrell heirs claiming garbage flowed in flood waters from a nearby canal bordering the Harrell acreage onto his property. This suit was first filed in District Court and assigned to Judge Donald Johnson. Washington pointed out *truthfully* in an on-line blog exchange at issue here that Saucier first filed his garbage claim in district court but it was assigned to an African-American Judge. Saucier dismissed his action without prejudice and re-filed it in Pineville City Court where it would be heard by Judge Phillip Terrell (Terrell), a white judge. Judge Terrell later ran for District Attorney and while campaigning discussed his ruling in the Harrell/Saucier matter on the local radio talk show that is also at issue here. Washington, as a representative for the Harrell family, escorted the Judge to the site to show him the garbage. During this visit, Washington showed the Judge that there were "baby diapers and other paraphernalia" and "beer and liquor bottles" on Saucier's property. He explained to the Judge the Harrell family had no infants at the camp house and the Harrell family did not drink alcohol. Judge Terrell eventually awarded Saucier $15,000.00 in damages for the garbage, plus $2,000.00 for costs and interest. The Harrell heirs tried to pay the money judgment, but Saucier would

not accept payment and instead filed a lien against the Harrell heirs' property. The Harrell heirs asked the district court to compel Saucier to accept payment and the court eventually ordered him to do so. This matter was assigned to Judge Donald Johnson, who the article later written by Mr. Aswell quotes as saying: "he did not know how things were done in Pineville, but that the case looked suspicious to him but he was helpless under the law to remedy the situation." Saucier did not present anything in this record to show that this statement was not made by Judge Johnson. Further, there was no affidavit introduced by Saucier from Aswell to say where he obtained that information.

In 2004, Saucier constructed a ten (10) foot tall fence that surrounds the Harrell tract, along with a ten (10) foot wide cattle guard and two gates crossing the right-of-way to the Harrells' property. He notified the Harrells and provided them with two keys to the gates. The Harrell family, unable to pass through the gates with their tractors and other farm implements, filed suit against Saucier to enjoin him from interfering with their servitude of passage across his property which they had used since 1929. The action was apparently set for trial in November, 2008, but at some stage of the proceeding the parties agreed in open court, according to Saucier, and this court's previous opinion, to enter into a settlement whereby the Harrells would gain a servitude of passage over his property, they would agree to pay for a surveyor to set boundaries, they would pay for any widening of the gates, and the court would later determine any compensation due Saucier.[1] The choice of surveyor depended on Saucier's

---

[1] [Erris–Omega counsel]: Your honor, as we've discussed in the back we have reached an agreement on almost all issues involved in this matter. The parties intend and hereby stipulate that they shall enter into a predial servitude agreement granting the [Harrells]—once they get a court order from the [G]rant [Parish] succession, authorizing them to accept this and enter into this contract, we would

(continued . . .)

approval as did any enlargement of the gates which were too narrow to allow the Harrells to pass equipment through. The entire proposed settlement agreement was also contingent on approval by the district court in Grant Parish that was handling the Harrell succession matter. The Harrell heirs did not execute any settlement documents and alleged they did not agree to such an arrangement. Saucier, in March, 2009, filed a motion to enforce the settlement agreement which was fixed for April 20, 2009. The Harrells' lawyer asked for a continuance and did not show up for the hearing. The lawyer filed a motion by facsimile on April 15, 2009, requesting the continuance of a hearing set for "May 20, 2009." The clerk

_____
(. . . continued)

> grant them a 13.5 foot wide right-of-way which would run from the levee down to the gate that is located right before the rail road [sic] tracks.

> That will all have to be surveyed and [the Harrells] will pay the expense, they will obtain a registered surveyor, subject to our approval, it shouldn't be problematic, that that will be at their cost.

> With respect to court costs the prior judgment cast the plaintiff in court cost for that rule. Aside from that, each party will pay their own court cost.

> With respect to the gates that are already existent, those are to remain in their present state, including the cattle guard unless they [the Harrells] decide to make an alteration to extend the width of the cattle guard from the 10 foot to 16 feet or whatever, fitting within the current fencing there. That would have to be done at their expense, subject to our approval of the plans.

> The gates are to remain—the two gates are to remain locked at all times save and except when the [Harrells] are passing through it.

> Two extra keys will be issued as to [Erris–Omega's] gate on the levee.
> And, Your Honor, we don't have authority at this time, we're fairly comfortable that we will be able to obtain, for their convenience, two extra keys to the Bobby Smith gate as well.

> . . . .

> And, Your Honor, we will preadmit [sic] the issue of compensation to be paid for the taking of the right-of-way and we will attempt to work that out if we can. **If not, we may return to the Court, whether by memorandum or hearing for the Court to adjudicate that aspect.**

*Succession of Harrell v. Erris-Omega Plantation, Inc.*, 10-138, p. 2 (La.App. 3 Cir. 6/2/10), 41 So.3d 1215, 1217, *writ granted*, 10-2059 (La. 12/17/10), 50 So.3d 158 (emphasis added).

3

received the hard copy of the motion on April 27, 2009 and it was signed by the court. But the hearing had already occurred on April 20, 2009, when the trial judge granted the motion in favor of Erris-Omega ordering the Harrells to execute and fulfill the terms and conditions contained in the servitude agreement within sixty days of the date of the judgment. Notice of this judgment was received by the Harrells' lawyer on April 30, 2009. In June, 2009, and within the 60-day window, the Harrells filed a petition to annul this judgment. Saucier filed an exception of no cause of action to the petition to annul. The **Exception** was fixed for hearing on September 28, 2009. The Harrells and their lawyer appeared for the hearing. On December 1, 2009, the trial judge granted Saucier's exception of no cause of action dismissing the Harrells' petition to annul. The trial judge also dismissed all of the Harrells' claims for injunctive relief and recognition of a servitude of passage with prejudice for their failure to execute and fulfill the settlement agreement within sixty days as ordered in the April 20, 2009 ruling. He also prohibited the Harrells from entering upon Saucier's property in the future. The Harrells filed an appeal with this court and the panel affirmed the judgment.[2] The Harrells then filed writs with the Louisiana Supreme Court. On December 17, 2010, the **Supreme Court reversed our ruling and the trial court rulings** sustaining the exception of no cause of action, thereby reinstating the Harrells' action to annul and further finding that "the [judgment] goes well beyond the initial pleadings by granting relief not prayed for." Significantly, the court made the following observations and rulings:

> **WRIT GRANTED**. The courts have recognized that a judgment may be annulled for fraud and ill practices when (1) the circumstances under which the judgment was rendered show the deprivation of legal rights of the litigant who seeks relief and (2) enforcement of the

[2]*See Succession of Harrell v. Erris-Omega Plantation*, 41 So.3d 1215.

judgment would be unconscionable or inequitable. *Calcasieu Parish School Board v. Parker,* 02–0339 (La. App. 3 Cir. 10/2/02), 827 So.2d 543, *writ denied,* 02–2719 (La.1/10/03), 834 So.2d 440. Plaintiffs' Petition to Annul, which must be considered on the face of the pleading in ruling on an exception of no cause of action, alleges sufficient facts to assert a cause of action under La. C.C.P. art. 2004 to annul the April 20, 2009, judgment for fraud and ill practices. **Not only was the judgment rendered in plaintiffs' and counsel's absence, due in part to confusion over a continuance request, but it goes well beyond the initial pleadings by granting relief not prayed for. In addition, the record does not support the defendant's assertion that a settlement of the claims was reached by the parties. In fact, price was still at issue and the succession representative had not yet obtained court approval. Accordingly, the judgments of the court of appeal and the trial court are reversed, and the case is remanded to the trial court for further proceedings on plaintiffs' petition to annul the April 20, 2009, judgment of the trial court.**

*Succession of Harrell v. Erris-Omega Plantation*, 10-2059 (La. 12/17/10), 50 So.3d 158 (emphasis added).

The Supreme Court remanded the matter for "further proceedings on plaintiff's petition to annul the April 20, 2009 judgment of the trial court." Plaintiffs' lawyer again did not show up after filing a motion to continue. On August 24, 2011, the judge then dismissed the nullity suit with prejudice. We affirmed[3] and the supreme court denied writs.[4]

---

[3]*Succession of Harrell v. Erris-Omega Plantation, Inc.*, 12-696 (La.App. 3 Cir. 12/5/12), 104 So.3d 751, *writ denied*, 13-438 (La. 4/5/13), 110 So.3d 595.

[4]In denying writs on the trial court's dismissal of the nullity action on remand, the supreme court did not re-instate the trial judge's December judgment on the exception of no cause of action which also dismissed the Harrells' original petition seeking injunctive relief and recognition of a servitude of passage.

Louisiana Civil Code Article 1767 provides "A conditional obligation is one dependent on an uncertain event." We note for example, the executor of the Harrells' estate must get court approval of the proposed settlement—the heirs do not have legal authority to act apart from the executor and the court in Grant Parish. The transcription of the memorandum of understanding acknowledges the existence of this fact. The heirs did not and could not bind the Grant Parish court to approve the alleged settlement—the court was not a party and it is not certain the court will do so. The heirs' obligation to perfect the deal also depends on Saucier's sole discretion to approve the choice of surveyor, and the size to which the gates can be enlarged. Under the provisions of La.Civ.Code art. 1770: "A suspensive condition that depends solely on the whim of the obligor makes the obligation null." Price was not agreed on but was left to be determined by the parties "if they could," and this too is dependent on court approval in the Grant Parish

(continued . . .)

5

Saucier thereafter addressed a letter to the Harrell heirs and sent a copy to his attorney and their attorney in essence informing them that the case was final and over in all respects. He declared that the December 1, 2009 judgment was final with the supreme court's denial of writs. Contrary to Saucier's assertion in his letter to the Harrells, the supreme court denial of writs has no meaning other than the court simply refused to consider the matter. "A writ denial by this Court has no precedential value." *St. Tammany Manor, Inc. v. Spartan Bldg. Corp.*, 509 So.2d 424, 428 (La.1987).[5] As noted, the supreme court reversed the December 1, 2009 judgment dismissing the annulment action and further reversed the portion which dismissed the Harrells' petition seeking injunctive relief and recognition of a servitude of passage, and which barred them from entering upon Saucier's property forever. Saucier's later pronouncement to the Harrells that they now are forever barred from seeking a servitude of passage to their ancestral property references the trial court's December 1, 2009 judgment which has been set aside and has no effect.

_____

(. . . continued)

district court. If the parties could not agree on the price then it was to be determined by the trial court in the appropriate proceedings. These are all suspensive conditions. Additionally, under the provisions of La.Civ.Code art. 1769: "A suspensive condition that is unlawful or impossible makes the obligation null." Entering a settlement without the required approval from the Grant Parish court handling the succession was unlawful and impossible, thus the underlying obligation to perform may be unenforceable. The supreme court did not have to worry about this when it denied writs because the remedy for the alleged failure of the Harrells to comply with the agreement was not before it.

[5]When the trial judge dismissed the nullity action the only things remaining were the original petition and the April 20, 2009 judgment recognizing the settlement and ordering its execution within sixty days. Further, when Saucier wrote a letter advising the Harrells that they are forever barred from entering his property and the matter was final, the case had not been re-fixed for hearing to address the Harrells' alleged failure to comply. La.Code Civ.P. art. 2504 provides a reasonable remedy for the failure to specifically perform acts directed by a judgment. The court may direct the acts to be done be performed by a third party appointed by the court at the disobedient party's expense, "with the same effect as if done by the party." Additionally, since a settlement is a contract between the parties, La.Civ.Code art. 2013 provides:

> In an action involving judicial dissolution, the obligor who failed to perform may
> be granted, according to the circumstances, an additional time to perform.

In his letter, Saucier also laments the long years of struggle in the courts for the Harrells and "benevolently" allows them access to their "forever unreachable" property to remove movable property within two weeks. He reminds them that he often offered to buy their property but they "rudely rebuffed" him. He then reminds them they owe $1,598.57 in court costs and demands he be notified within five days of their intent to voluntarily pay or he will have to sue them again.

Subsequently, Saucier filed the present defamation suit against Washington and Aswell, publisher of Louisiana Voice, alleging they defamed him by making comments in an on-line article (written by Aswell) and in the blog posts and comments concerning the subject of the article "politics at its worst." Saucier also alleged in his amended petition that Washington defamed him on radio and in campaign literature published in the district attorney race. Washington and Aswell filed motions to protect their constitutionally protected right to free speech on matters of public interest through Louisiana's anti-SLAPP (strategic lawsuits against public participation) motion provided in La.Code Civ.P. art. 971(emphasis added):

A. (1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a probability of success on the claim.

(2) In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

(3) If the court determines that the plaintiff has established a probability of success on the claim, that determination shall be admissible in evidence at any later stage of the proceeding.

B. In any action subject to Paragraph A of this Article, a prevailing party on a special motion to strike shall be awarded reasonable attorney fees and costs.

7

. . . .

F. As used in this Article, the following terms shall have the meanings ascribed to them below, unless the context clearly indicates otherwise:

(1) "Act in furtherance of a person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue" includes but is not limited to:

(a) **Any written or oral statement or writing made before a legislative, executive, or judicial proceeding**, or any other official proceeding authorized by law.

(b) **Any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body**, or any other official body authorized by law.

(c) **Any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest.**

(d) **Any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.**

(2) "Petition" includes either a petition or a reconventional demand.

(3) "Plaintiff" includes either a plaintiff or petitioner in a principal action or a plaintiff or petitioner in reconvention.

(4) "Defendant" includes either a defendant or respondent in a principal action or a defendant or respondent in reconvention.

It is noteworthy that the Louisiana legislature set forth its reasons for and purpose of this law:

Section 2. The legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances. The legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. **To this end, it is the intention of the legislature that the Article enacted pursuant to this Act shall be construed broadly.**

La.Code Civ.P. art. 971, comments (emphasis added).

8

As the U.S. Fifth Circuit noted in *Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 164, 177 (5th Cir. 2009)(emphasis added):

> . . . Article 971 aims to serve the substantial public interest of protecting those exercising their First Amendment rights from the chilling effect of defending meritless and abusive tort suits. Article 971 does so by immunizing speakers from suits stemming from the exercise of First Amendment rights, thus preserving both an individual's right to speak and **the public's collective interest in free and robust debate.**

The trial court granted Aswell's motion to dismiss but denied Washington's motion. Saucier filed a writ with this court seeking to overturn the trial court's dismissal of Aswell. Washington filed a writ with this court seeking to overturn the trial court's denial of his motion to dismiss. The writs were consolidated in this court. In a separate ruling we denied Saucier's writ seeking to overturn the trial court's granting of Aswell's motion to dismiss. *Wilbert Saucier, Jr. v. Robert E. Washington, Sr.*, 17-564 (La.App. 3 Cir. 7/24/17).

## LEGAL ANALYSIS

### Mr. Washington's "Anti SLAPP" Motion

The trial court's action denying Washington relief is immediately reviewable by this court on writs as the federal court recognized we have said in the past:

> In Louisiana state courts, an unsuccessful movant can obtain immediate appellate review of the trial court's denial of the Article 971 motion through a writ of supervision under Article 2201 of the Louisiana Code of Civil Procedure. *See* La.Code Civ. Proc. art. 2201 ("Supervisory writs may be applied for and granted in accordance with the constitution and rules of the supreme court and other courts exercising appellate jurisdiction."). **Several Louisiana courts of appeal have immediately reviewed a trial court's denial of an Article 971 motion pursuant to these supervisory writs.** *See, e.g., Darden v. Smith, 879 So.2d 390, 393 (La.App. 3d Cir.), writ denied, 887 So.2d 480 (La.2004); Baxter, 847 So.2d at 230; Benson v. City of Marksville, 812 So.2d 687, 690 (La.App. 3d Cir.), writ denied, 817 So.2d 1158 (La.2002).*

*Henry*, 566 F.3d at 170(emphasis added).

9

Our review of the trial court's ruling on this La.Code Civ.P. art. 971 motion is de novo. *Gwandiku v. State Farm Mut. Auto Ins. Co.*, 07-580 (La.App. 3 Cir. 10/31/07), 972 So.2d 334. Having reviewed the record submitted with the application for writ of review, we too agree with the trial court's conclusion that Washington met his burden to prove this suit involves matters of public interest. As the trial judge remarked in his reasons for judgment, the article and blog addressed "Greed, race, class warfare, political corruption, [and] unethical behavior by judges and lawyers…" It is also apparent that most, if not all, of Washington's comments in the blog, and information used by Aswell in his article, all come from pleadings, court documents, and judicial decisions in matters involving Washington and the other Harrell heirs. This too, entitles him to invoke the protection of Article 971.

**Saucier's Burden of Proof to Defeat 971 Motion.**

The Defendant having met his burden to prove his statements involved matters of public interest and included matters which had been presented in judicial forums, the burden now shifts to Saucier to "demonstrate a probability of success on his claim." *Henry*, 566 F.3d at 170:

> Article 971 establishes a burden-shifting analysis for weeding out frivolous claims. To succeed on an Article 971 motion, the defendant must first make a prima facie showing that Article 971 covers the activity underlying the suit. That is, the defendant must "establish[ ] that a cause of action against him arises from an act by him in furtherance of the exercise of his right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue." *Starr v. Boudreaux,* 978 So.2d 384, 388–89 (La.App. 1st Cir.2007). If the defendant makes this showing, "the burden then shifts to the plaintiff to demonstrate a probability of success on his claim." *Id.* at 389.

In *Fitzgerald v. Tucker*, 98-2313 (La. 6/29/99), 737 So.2d 706, 715–17 (emphasis added), the Louisiana Supreme Court explained a defamation action:

A cause of action for defamation arises out of a violation of Civil Code article 2315. *Vicknair v. Daily States Pub. Co.,* 153 La. 677, 96 So. 529 (1923); Ferdinand F. Stone, 12 *Louisiana Civil Law Treatise Tort Doctrine* § 176(c), at 227 (1977). Defamation involves the invasion of a person's interest in his or her reputation and good name. *Sassone v. Elder,* 92-1856 (La.10/18/93), 626 So.2d 345, 350 (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 111 (5th ed.1984)). **In order to prevail in a defamation action, a plaintiff must necessarily prove four elements: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury.** *Trentecosta v. Beck,* 96-2388 (La.10/21/97), 703 So.2d 552, 559 (citing Restatement (Second) of Torts § 558 (1977)); *see Cangelosi v. Schwegmann Bros. Giant Super Markets,* 390 So.2d 196, 198 (La.1980) (**considering falsity as a fifth and separate element). In other words, a plaintiff must prove " 'that the defendant, with actual malice or other fault, published a false statement with defamatory words which caused plaintiff damages.**' " *Trentecosta,* 703 So.2d at 559 (quoting *Sassone,* 626 So.2d at 350).

. . . .

Nonetheless, not all defamatory statements are actionable. Rather, many statements are protected by the First Amendment's guarantee of freedom of speech. For example, " '**a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.**' " *Romero v. Thomson,* 94-1105 (La.1/17/95), 648 So.2d 866, 870 (quoting *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)). Also, **"[s]peech on matters of public concern enjoys enhanced constitutional protection**." *Romero,* 648 So.2d at 869.

. . . .

"**[E]ven if an opinion gives rise to false factual inferences, the defendant will be liable only if the statement was made with 'knowing or reckless falsity**.' " *Id.* & n. 6 (footnote omitted) (quoting *Mashburn,* 355 So.2d at 885). Moreover, "the factual inference created by the statement [of opinion] must be ascertainable by a reasonable person with some degree of certainty." *Id.* at 378. "Otherwise, juries would be asked to engage in guessing-games about possible uncomplimentary inferences that can be drawn from statements of opinion, and the First Amendment protections afforded in this area would become worthless." *Id.* (footnote omitted); *see* Restatement (Second) of Torts § 566 cmt.(c)(4). In sum, an expression of opinion is actionable only if it implies the existence of underlying facts ascertainable by a reasonable person with some degree of certainty, and the implied factual assertions are false, defamatory, made with actual malice, and concern another.

11

Additionally, our courts, state and federal, have long held:

> A plaintiff contesting an Article 971 motion must show a probability that she will be able to establish all of the elements of her tort claim. *Baxter,* 847 So.2d at 233. . . . "In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." La.Code. Civ. Proc. art 971(A)(2); *see also Baxter,* 847 So.2d at 232.
>
> "To establish a probability of prevailing on his claim, a plaintiff must state and substantiate a legally sufficient claim. This is done through a prima facie showing of facts sufficient to sustain a favorable judgment." *Baxter,* 847 So.2d at 231–32. **This requires more than that which is necessary to survive a normal motion to dismiss, as "a defamation plaintiff must produce evidence of sufficient quality and quantity to demonstrate that he will be able to meet his burden of proof at trial.**" *Estiverne v. Times–Picayune, L.L.C.,* 950 So.2d 858, 860 (La.App. 4th Cir.2006) (quotation marks omitted). As one Louisiana court has noted, **establishing a probability of success is a "difficult burden." *Baxter,* 847 So.2d at 235. This burden is justified, however, as "the necessity of protecting our constitutional rights of free speech and petition, <u>particularly when exercised in relation to public issues or matters of public interest,</u> requires the imposition of this burden on a plaintiff who brings a defamation action impacting these rights."** *Id.*

*Henry*, 566 F.3d at 181–82 (emphasis added).

**Saucier Fails to Show Damages/Injury.**

First, we find Saucier utterly failed to show any chance of prevailing on the element of damages ("resulting injury"). There is absolutely no evidence in the record showing any damage to Saucier. In matters of public interest defamation cases there is no presumption of damages:

> **A private figure plaintiff claiming defamation from a factual misstatement on a public issue cannot recover presumed or punitive damages without showing actual malice.** *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

*Romero v. Thomson Newspapers (Wisconsin), Inc.*, 94-1105, pp. 6-7 (La. 1/17/95), 648 So.2d 866, 870, *cert. denied*, 515 U.S. 1131, 115 S.Ct. 2556 (1995)(emphasis added).

Thus, to survive this Article 971 motion, Saucier had to put forth evidence to show (1) damages as a result of the alleged defamation; and (2) proof of malice. There is nothing that could be posited as evidence here that suffices to satisfy Saucier's burden—arguments and briefs are not evidence. This failure alone required the granting of Washington's Article 971 Motion and a dismissal of Saucier's case.

**Saucier Fails to Show Washington Made Untrue Statements**.

In a case recently before this court, the panel, consisting of Judges Amy, Peters and Savoie, granted a writ, reversed the lower court, and granted the Article 971 motion to strike, remanding the matter for a determination of attorney fees and costs to be awarded to movant. The panel found that the parties' pleadings alone were not sufficient to carry the plaintiff's burden to prove the probability of success on its defamation claim. Neither party submitted affidavits in support of its claims. Judge Amy wrote for the majority: "Simply, the adverse pleadings offer no insight into the elements of **falsity**, unprivileged publication to another, **fault**, and **injury** . . ." *Ahearn v. City of Alexandria*, 15-1014, 15-1189, p. 9 (La.App. 3 Cir. 5/4/15), 191 So.3d 689, 695 (emphasis added). Likewise here, the adverse pleadings offer no evidentiary support favoring the success of Saucier's claim. The only affidavit in the record is Washington's, leaving his testimony therein uncontroverted. In *Henry*, 566 F.3d 177, much as in this case, the only evidence presented was reprints of the newspaper article and an affidavit by Henry's attorney. Here, the only evidence presented are reprints of the blog posts/comments and the article "Land Grab in Rapides: Lawyer Buys 2200 Acres Surrounding Black Family and Then Fences Them Out of Their Own Property," Louisiana Voice, and an affidavit by Washington.

13

The sworn statements in Washington's affidavit are uncontradicted by any affidavit or testimony. Washington attests in his affidavit that he "did not author [the] article or write any of its content [and] he did not review the article prior to its publication." He further attests he "did not tell Aswell what to write or even suggest what to write in the article [and] he never conspired with Aswell about what to write and did not know whether Aswell would even write an article." Saucier offered no evidence to contradict this evidence. The trial court in its reasons for judgment refers to a retraction of the article by Aswell and a written response by Saucier. Neither Aswell's alleged retraction nor Saucier's alleged response is found in this record. Even if we had the benefit of reading Aswell's alleged retraction and Saucier's response there is no affidavit to support the truthfulness of either. There is absolutely no evidence regarding the alleged radio defamatory statements and no evidence regarding any campaign literature. Thus the only allegations in Saucier's petition supported by anything at all are limited to the comments in the blog and, for that, all we have is a copy of the comments made by citizens and Washington in the ongoing dialogue in the blog.

Washington attached to his affidavit a letter from Saucier's attorney stating that Saucier did in fact erect a fence around the Harrells' property because he was putting a special breed of deer on his property, and as Washington attests these "facts which were discussed in the article, . . . are, therefore true." He also attached a copy of a letter from Saucier to the Harrell heirs informing them of the final judgment issued by the trial court, which Saucier alleged prohibits them, their heirs or assigns forever from obtaining a servitude across his property. As Washington attests in his affidavit, this letter is proof that Aswell's statement in his

article to the effect that the Harrell heirs no longer have access to their property and that they were informed of this directly by Saucier is also true.[6]

Washington provides uncontroverted testimony in his affidavit regarding his comments on a radio talk show. Saucier failed to introduce as evidence transcripts or audio copies of the radio comments he finds so offensive. The only evidence in the record is Washington's uncontradicted affidavit which shows he spoke on the public radio program in response to District Attorney candidate Philip Terrell's discussion of the Saucier and Harrell litigation during his campaign for D.A. Terrell was the judge who awarded damages to Saucier in the "trash" case against the Harrell heirs. Terrell first placed the matter in the public arena and Washington enjoyed the constitutional right to freely express his side of the story and to state his opinion that he and his family did not feel fairly treated in the matter—in their **opinion** the judge did not rule fairly in light of the evidence presented and they believed the judgment was excessive. According to Aswell's article, District Judge Johnson stated on the record he agreed with that sentiment but was powerless to do anything about the injustice because it was not part of the case before him. Saucier did not present one scintilla of evidence to show the judge did not make such comments or to show Washington *knew* he was making a false statement. It was

---

[6]When the land-grab article was written by Aswell stating the Harrell heirs could not ever return to their property, only Saucier's letter confirmed that as a fact. Saucier did not mention in his letter that any subsequent proceeding had been scheduled to revisit what measures might be put in place to enforce the April 20, 2009 sixty-day deadline. Without a new hearing Saucier's representations were understandably confusing to Washington. A properly scheduled hearing with notice to address the issue of the appropriate remedy (if any) for the Harrells' alleged failure to execute and fulfill the settlement agreement within sixty days as ordered in the April 20, 2009 judgment (which elapsed while they were seeking to annul it) had not occurred. The appropriateness of the remedy may very well depend on whether this failure is justifiable or resulted from conditions or events outside their control as noted in footnotes four and five.

We previously pointed out the judgment of the State Supreme Court reversing the trial court's December 2009 ruling prevents it from having any res judicata effect on the Harrell heirs' claim for injunctive relief and other relief or the enforcement of the April 20, 2009 settlement order.

Terrell who chose to use the Harrells' case as an example to show he had given what he considered fair treatment to black litigants in his court. He opened the door to public discourse in his race for D.A. Washington had every right to speak out. Saucier's allegations of defamation stemming from the radio show remain wholly unsupported by any evidence.

Washington provided evidence in his affidavit of the truthfulness of his statements, and statements in the blog article, that Saucier did in fact first file his trash suit in district court, it was assigned randomly to a black judge, he unilaterally dismissed the suit without prejudice and promptly filed it in Pineville City Court where it would be heard by Judge Terrell, a white judge. Thus, the question put forth by Washington as food for thought in the blog—could this have been judge forum shopping—is not presumptively malicious or false, or such an outrageous thought, idea or opinion that only evil motive can be assigned the inquiry.

**Malice: proof of knowledge of the falsity; reckless disregard for the truth.**

> Malice (or fault), for purposes of the tort of defamation, is a *lack of reasonable belief in the truth of the statement* giving rise to the defamation. *Douglas v. Thomas,* 31,470, pp. 4-5 (La.App. 2 Cir. 2/24/99), 728 So.2d 560, 563, *writ denied,* 99-0835 (5/14/99) 741 So.2d 661 (*citing Bell v. Rogers,* 29,757 (La.App. 2 Cir. 8/20/97), 698 So.2d 749); *Cotonio v. Guglielmo,* 176 La. 421, 146 So. 11, 13 (1933) ("Malice, arising from the publication of a false and injurious charge, without probable cause for thinking the charge is true, suffices [to sustain the action for libel]."); *Steed v. St. Paul's United Methodist Church,* 31,521, 31,522, pp. 10-11 (La.App. 2 Cir. 2/24/99), 728 So.2d 931, 940, *writ denied,* 99-0877 (La.5/7/99), 740 So.2d 1290; *Neuberger, Coerver & Goins v. Times Picayune Pub. Co.,* 597 So.2d 1179, 1182 (La.App. 1 Cir.1992) (*quoting Redmond v. McCool,* 582 So.2d 262, 265 (La.App. 1 Cir.1991) ("**Only when a statement is found to be made without reasonable grounds for believing it to be true can the person uttering the statement be found to be actuated by malice or ill will**."). **Malice in this sense is more akin to negligence with respect to the truth than to spite or improper motive.** *See,* RESTATEMENT (SECOND) OF TORTS § 580B (1977) which defines the malice (or fault) necessary to sustain a defamation action as publication by **one who "(a) knows that the**

16

**statement is false** and that it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them."

*Costello v. Hardy*, 03-1146, pp. 18-19 (La. 1/21/04), 864 So.2d 129, 143–44

(emphasis added).

The Louisiana State Supreme Court in *Romero*, 648 So.2d at 869-70,

(emphasis added) also explained:

> **Actual malice is demonstrated by a false statement made with knowledge of its falsity or with reckless disregard for the truth. There is authority for applying the *New York Times* rule when an article concerns public issues, even though the plaintiff is a private person.** *Rosenbloom v. Metro Media, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971).
>
> . . . .
>
> **Speech on matters of public concern enjoys enhanced constitutional protection**. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). See *The Florida Star v. B.J.F.,* 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989). Hyperbole, which could not reasonably be interpreted as stating actual fact, is protected. *Greenbelt Cooperative Publishing Ass'n v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970).
>
> . . . .

The Louisiana Constitution guarantees freedom of the press in Article 1, § 7, as follows:

> **Freedom of Expression**
>
> Section 7. No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom.
>
> Truth is a defense, and it is sufficient if an allegedly libelous article is substantially true: unimportant details need not be accurate. *Otero v. Ewing,* 165 La. 398, 115 So. 633 (1927).

As we have said previously, there is absolutely no evidence presented by Saucier showing Washington acted with "actual malice" in uttering any of the statements he made. In *Gertz v. Welch*, 418 U.S. 323, 328, 94 S.Ct. 2997, 3001

17

(1974), the U.S. Supreme Court defined actual malice as "with knowledge that it was false or with reckless disregard of whether it was false or not." This record belies any such conclusion as to anything stated by Washington in the blog posts or attributable to him in the news article.

**Washington's Opinions Are Not Defamation**.

> If a statement expresses an opinion, a defamation action must fail, unless the opinion implies a false and libelous fact and the opinion was expressed with actual malice. *Bussie v. Lowenthal,* 535 So.2d 378 (La.1988).

*Romero*, 648 So.2d at 870.

Washington did no more than express his opinion based on the facts he knew from his involvement in legal proceedings and from information made public during Terrell's campaign for election as D.A. The entirety of the remarks which Saucier alleges are defamatory are no more than opinion which the speaker sought to explain in light of the facts he reasonably believed to be true. The truthfulness of Washington's factual statements regarding litigation between the Harrells and Saucier is supported in this court's previous opinions of which we may take judicial notice. This litigation, to the say the least, has a contorted procedural history and would no doubt be confusing to most lay members of our society. The blog article in which references are made to the court proceedings was written by Mr. Aswell. As noted earlier, there is no affidavit from Mr. Aswell stating that Washington is responsible for any of the content except to point him to the court documents which we have now reviewed. Washington's expression that a judge is supposed to be neutral and unbiased is not untrue. His reservation that something else might have been going on in this case was not made without any factual basis.[7]

---

[7]Judge Gremillion noted in this court's previous opinion the idea that the Harrells be forever barred from seeking any servitude across the Erris–Omega property first arose from a

(continued . . .)

18

More important here, Saucier presented no evidence to show Washington acted with malice in voicing his unease with rulings made in the litigation.

Washington encouraged and invited open and public debate and discourse on the matter and urged Saucier to give his side of the story. Washington attests in his affidavit that he "along with many other persons who were discussing various topics of public interest including elections, property rights and judicial cases" made comments in the blog. Our review of those comments reveal Washington merely gave his opinion which he supported by truthful facts gleaned from actual lawsuits in which he was involved as a party. From this scant record, and reading the reported opinions of this court and the Louisiana State Supreme Court, it is apparent that Washington relied on those cases for many of the facts that formed the basis of his statements and opinions. He invited the readers to **think for themselves, to investigate for themselves, and to form their own opinions. He even invited Saucier and others mentioned to respond with their version of the facts and to give their opinions and assessments of the matters discussed.**

We also disagree with the trial judge's conclusion that the generic reference to judges and lawyers and association with the KKK (Ku Klux Klan) in any way indicated Washington was referring to anyone in particular. It was a general statement of his opinion based upon information easily found in historic records. Additionally, no evidence as to the statement's falsity was introduced by Saucier nor did he produce any evidence that such was in any way damaging to his reputation. Even more fatal is his failure to present any evidence that Washington

_____
(. . . continued)

suggestion by the trial judge who heard the April 2009 motion as a possible result for their failure to execute the settlement.

*Succession of Harrell v. Erris-Omega Plantation, Inc.*, 41 So.3d at 1218.

*knew* that none of the members of the judiciary or lawyers have any connection to the Klan. All in all, the reader is left to draw his/her own conclusions regarding the matters discussed and is encouraged to investigate both sides' claims for him/herself. That is what freedom of speech is all about.

The trial judge in his written reasons for judgment gives us insight into his flawed reasoning process. He relied on comments in the blog made by persons other than Washington to conclude "It is obvious that the basic assertion was that Saucier was misappropriating the property of the Harrells without any legal justification." He based this on the posted comment by someone identified as "Tony T." who stated "Besides BULLYING, this is an act of STRONG ARM ROBBERY (knowingly taking someone's rights to his/her property this is no different)…" *But this only shows Tony T.'s opinion on the matter.* This is by no means evidence of defamation by Washington. Tony T. arrived at his *opinion* based on the facts reflected in the court cases, letters from Saucier and his lawyer, and other truthful information referred to in the blog and article. The judge sought to use his interpretation of comments by unknown persons on the blog to conclude these "comments further corroborate that these apparently ordinary persons understood the comment to be a statement of fact." All that one can conclude from Tony T.'s or any other comments on the blog, whether favorable or unfavorable to Saucier or Washington, is that this matter of public interest generated lively debate and each reached their own opinion through open and public discourse.

We further disagree with the trial judge's conclusion that:

> It is clear that Mr. Aswell did very little investigation as it pertains to the accuracy of this article. He simply took the word of Mr. Washington and wrote an article that was clearly printed in an effort [to] present a sensational story which hit on almost every hot button in today's society. Greed, race, class warfare, political corruption, unethical behavior by judges and lawyers, were addressed

in the article without any attempt to hear the "rest of the story" as once expressed by Paul Harvey.

There is no evidence to support his conclusion and, in fact, the only evidence, presented through Washington's affidavit, is totally to the contrary. There is absolutely nothing in the record to support the trial judge's so-called "clear" observations. There is no evidence tending to show the lack of investigation, the accuracy of the article, the degree (if any) of Washington's participation (other than Washington's account in his affidavit), or any alleged attempt to "sensationalize" the story. Paul Harvey's closing comment "and now you know the rest of the story" cannot be relied upon to place a muzzle on Washington's right to free speech unless and until all the judges and lawyers unnamed in a news article or blog, speak too.

**Saucier Fails to Show an Unprivileged Dissemination of a Falsehood**.

As we have previously explained, most if not all of Washington's comments made in the blog were originally made in judicial proceedings in which he was a party and all of the information in Aswell's article was obtained from those proceedings. These comments enjoy a conditional privilege.

> [E]ven when a plaintiff makes a prima facie showing of the essential elements of defamation, recovery may be precluded if the defendant shows either that the statement was true, or that it was protected by a privilege, absolute or qualified. *Doe v. Grant,* 01-0175, p. 9 (La.App. 4 Cir. 1/29/03), 839 So.2d 408, 416, *writ denied,* 03-0604 (La.5/2/03), 842 So.2d 1102; *Arledge v. Hendricks,* 30,588, p. 4 (La.App. 2 Cir. 6/26/98), 715 So.2d 135, 139.

*Costello*, 864 So.2d at 141.

> In cases of defamation alleged to arise from statements made in pleadings or otherwise in the course of a judicial proceeding, the conditional privilege operates to protect "minimally offensive allegations necessary to state a cause of action." *See Costello,* 03–1146 at p. 16 n. 13, 864 So.2d at 142 n. 13. As the supreme court has observed on a number of occasions, "[l]itigants must be free to allege facts constituting inappropriate conduct if there is any reasonable basis for such allegations and the misconduct is relevant to the

21

proceeding." *Id.,* citing *Freeman v. Cooper,* 414 So.2d 355, 359 (La.1982).

*Jalou II, Inc. v. Liner*, 10-0048, p. 25 (La.App. 1 Cir. 6/16/10), 43 So.3d 1023, 1039.

Not only did Washington enjoy the protection of this privilege, we find his statements found objectionable by Saucier, were truthful and constituted his opinions which were not proven to have been made with malice.

**Conclusion**

For the reasons stated, the writ is granted and made peremptory; judgment is hereby rendered in favor of Washington granting his La.Code Civ.P. art. 971 Motion dismissing Saucier's suit with prejudice, and awarding Washington attorney fees for services rendered in both the trial court and this court in accordance with the provisions of La.Code Civ.P. art. 971(B). We award Washington attorney fees in this court in the amount of $5,000.00. The case is remanded to the trial court for a determination of the amount and an award of attorney fees for the work performed below. All costs of this appeal and all court costs in the trial court are assessed against Plaintiff.

**WRIT GRANTED AND MADE PEREMPTORY; JUDGMENT RENDERED; REMANDED WITH INSTRUCTIONS.**

STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT


WILBERT J. SAUCIER, JR.

VERSUS

ROBERT E. WASHINGTON, SR., ET AL.


**Savoie, J., concurs and assigns reasons.**

This matter involves the trial court's denial of a motion to strike Plaintiff's defamation action against Defendant Washington pursuant to La.Code Civ.P. art. 971. The defamation action arises out of an online political blog article written by Aswell, as well as the written comments Washington made to the online blog, which reference prior litigation between Washington's family and Plaintiff.

I concur with the decision in this matter based on the limited information provided in connection with the writ application. However, the information provided is problematic because it is unclear what evidence was submitted during the hearing on Washington's motion to strike. The minutes provided merely indicate that the court considered all evidence submitted, with no indication of what evidence was submitted.

La.Code Civ.P. art. 971(A)(2) states that, in considering a special motion to strike, "the court shall consider the pleadings and supporting and opposing affidavits stating facts upon which the liability or defense is based."

The Relator provided us with a copy of Plaintiff's original petition, as well as a copy of Aswell's blog article and Washington's comments thereto, which were attached to Plaintiff's petition. We were also provided with Plaintiff's amended and supplemental petitions. However, the information provided to us does not

contain any supporting affidavits or other evidence submitted by Plaintiff in support of his action. Plaintiff did not submit an opposition to the instant writ application or otherwise direct us to any such evidence.

Washington also provided us with a copy of his motion to strike, his supporting memorandum, and the exhibits attached thereto, which included an affidavit addressing and denying Plaintiff's allegations. It is unclear whether these documents were offered or accepted into evidence by the trial court.

I agree with the conclusion that, in connection with Mr. Washington's motion to strike, it was ultimately Plaintiff's burden to demonstrate a probability of success as to his alleged defamation action in order for Plaintiff to defeat the motion. I also agree with the conclusion that Plaintiff failed to satisfy that burden based on the limited information provided to us.

There is insufficient evidence establishing Plaintiff could prevail on the damages element of his defamation action. Further, the blog article and comments thereto are insufficient to establish the probability that Plaintiff could prove a defamation action against Washington. There is no evidence indicating that Aswell and Washington conspired together in connection with writing or publishing Aswell's article, as alleged, or that the information in Aswell's article was given to him by Washington. Washington states in his affidavit that he did not conspire with Aswell or otherwise provide him with any information other than court documents from prior litigation between the parties. Moreover, Washington references Plaintiff only twice in the comments he made to Aswell's article, and neither of those statements satisfy the elements required to establish a defamation action.[1] Similarly, Washington's other general comments and opinions in his comments also fail to support an actionable defamation action by Plaintiff.

---

[1] See, *Fitzgerald v. Tucker*, 98-2313 (La. 6/29/99), 737 So.2d 706.

2